**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|   |   |   |
|---|---|---|
| LINDA EASTMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 12-2170 |
| | : | |
| RESEARCH PHARMACEUTICALS, INC. | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

YOHN, J.                                                                                         July 31, 2013

Plaintiff, Linda Eastman, brings this action against ReSearch Pharmaceutical Services, Inc.[1] ("RPS"), alleging claims of discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq*., and violations of the Pennsylvania Human Relations Act ("PHRA"), 42 Pa.C.S.A.§§ 951 *et seq*. Currently before me is defendant's motion for summary judgment under Federal Rule of Civil Procedure 56. For the reasons set forth below, I will deny defendant's motion.

## I.  Factual Background and Procedural History[2]

### A.  Events Leading to Eastman's Termination

---

[1] In defendant's statement of material facts supporting its motion for summary judgment, defendant asserts that plaintiff improperly plead ReSearch Pharmaceutical Services, Inc. as ReSearch Pharmaceuticals, Inc. (Def.'s Statement of Material Facts, as to Which No Genuine Issues Exist, in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Facts") ¶ 1.)

[2] Except as otherwise noted, the following facts are undisputed.

RPS is a clinical research organization that places teams of experienced staff to conduct and manage clinical trials for its pharmaceutical clients. (Def.'s Facts ¶ 1; Pl.'s Resp. to Def.'s Statement of Facts ("Pl.'s Resp. to Def.'s Facts") ¶ 1.) Eastman began working for RPS as a clinical research associate ("CRA") on February 1, 2010. (Def.'s Facts ¶ 2; Pl.'s Resp. to Def.'s Facts ¶ 2.) As a CRA, Eastman's duties involved monitoring clinical trials, which included conducting site visits and site management activities, ensuring compliance with clinical trial protocol by the hosting physician, participating in conference calls with RPS's clients, and completing reports. (Def.'s Facts ¶ 3; Pl.'s Resp. to Def.'s Facts ¶ 3.) During most of her time working with RPS, Eastman reported to RPS clinical research manager Toni Contreras. (Def.'s Facts ¶ 4; Pl.'s Resp. to Def.'s Facts ¶ 5.) In February 2010, Eastman was assigned to monitor clinical trials for RPS's client Allergan. (Def.'s Facts ¶ 4; Pl.'s Resp. to Def.'s Facts ¶ 4.) While monitoring the Allergan clinical trials, Eastman primarily communicated with Allergan regional area manager Tricia Byrne. (Def.'s Facts ¶ 6; Pl.'s Resp. to Def.'s Facts ¶ 6.)

Neither party claims that there were issues with Eastman's employment prior to November 29, 2010, when Eastman contacted Byrne and notified her that she wanted to reschedule her Allergan site visit because of back pain. (Def.'s Facts ¶ 9; Pl.'s Statement of Facts ("Pl.'s Facts") ¶ 28.) Eastman's back pain and limited mobility had begun the previous week, around Thanksgiving 2010. (Pl.'s Facts ¶ 4.) Since Thanksgiving 2010, plaintiff had been having difficulty walking, bending, moving, lifting her legs, and changing physical positions. (*Id.* ¶¶ 5-8, 27.) During, Eastman's phone call with Byrne, Byrne notified her that the site visit could not be rescheduled and that Byrne would find someone to cover for Eastman. (Def.'s Facts ¶ 11; Pl.'s Facts ¶ 29.) Eastman responded that she would work through her back pain and attend the site

visit, although she would be late to the site.  (Def.'s Facts ¶ 12; Pl.'s Facts ¶ 30.) Eastman alleges that she notified Byrne that she would have to wear slippers because it was too difficult for Eastman to put on shoes. (Pl.'s Facts ¶ 30.)[3]

On November 30, Eastman drove from New Jersey to Garden City, New York, and checked into a hotel where she would reside during the Allergan Garden City clinical trial visit. (Def.'s Facts ¶ 14; Pl.'s Facts ¶ 32.) On December 1 and 2, 2010, Eastman was working at Dr. Jeffrey Lumerman's office in Garden City, New York, monitoring the clinical trial he was hosting for Allergan. (Def.'s Facts ¶ 17; Pl.'s Facts ¶ 33.) When Eastman stood up to go to the bathroom, Dr. Lumerman noticed that she was struggling to move and asked what was wrong. (Def.'s Facts ¶ 18; Pl.'s Facts ¶ 38.) Eastman responded that she had hurt her back and Dr. Lumerman offered to examine her. (Def.'s Facts ¶ 19; Pl.'s Facts ¶ 40.) After his examination, Dr. Lumerman noted that Eastman was suffering from significant discomfort with motion, bending, and walking, and diagnosed Eastman with musculoskeletal back pain. (Def.'s Facts ¶ 20; Pl.'s Facts ¶¶ 42-43.) Dr. Lumerman instructed Eastman to continue taking over-the-counter anti-inflammatory medication every six hours, rest, and apply heat. (Pl.'s Facts ¶ 44.) Additionally, Dr. Lumerman gave Eastman a Valium pill and instructed her to take the Valium as a muscle relaxant once she reached her next destination. (Def.'s Facts ¶ 20; Pl.'s Facts ¶¶ 46-47.) Dr. Lumerman had never treated Eastman as a patient before, and they only knew each other

---

[3]Defendant does not discuss whether Eastman notified Byrne of her need to wear slippers during the November 29th phone call; however, defendant does allege that plaintiff notified Byrne that she wore slippers to the site during the December 2nd conference call, which is discussed later in this section. (Def.'s Facts ¶ 36; Pl.'s Facts ¶ 30.)

because of their responsibilities in the Allergan clinical trial.  (Def.'s Facts ¶ 21; Pl.'s Resp. to Def.'s Facts ¶ 21.)

That same day, December 2, 2010, Byrne informed Eastman that Allergan needed to have a teleconference with her at 4 p.m. to discuss an audit report plaintiff had prepared. (Def.'s Facts ¶ 22; Pl.'s Facts ¶ 35.) Additionally, Byrne asked Eastman to fax a copy of the audit report to her prior to the teleconference.  (Def.'s Facts ¶ 23; Pl.'s Facts ¶ 36.)  Because the report was at Eastman's hotel room and not at Dr. Lumerman's office, Eastman left for her hotel at 3:00 p.m. (Def.'s Facts ¶ 24; Pl.'s Facts ¶ 51.) At 3:30 p.m., upon returning to her hotel room, Eastman took the Valium given to her by Dr. Lumerman.  (Def.'s Facts ¶ 26; Pl.'s Facts ¶ 52.) After she took the Valium, Eastman went down to the hotel's business center to fax the report to Byrne. (Def.'s Facts ¶ 27; Pl.'s Facts ¶ 54.) When Eastman returned to her room, she realized that she had locked herself out. (Def.'s Facts ¶ 28; Pl.'s Facts ¶ 55.) Consequently, Eastman needed to get a key from the lobby, resulting in her being a few minutes late for the teleconference.  (Def.'s Facts ¶ 29; Pl.'s Facts ¶ 55.)

Eastman called into the teleconference with Byrne and another Allergan employee named Lisa. (Def.'s Facts ¶¶ 30-31; Pl.'s Facts ¶ 57.) During the beginning of the teleconference, Eastman was laughing because she had locked herself out of the room. (Pl.'s Facts ¶ 58.) Byrne asked Eastman if she was okay. (*Id.* ¶ 59.) Eastman discussed her back pain with Byrne. (*Id.* ¶ 60.)  Additionally, Eastman told Byrne that she had taken a Valium pill given to her by Dr. Lumerman. (*Id.* ¶ 61.)

Later that night, Contreras received a phone call from Byrne to discuss her teleconference with Eastman. (Def.'s Facts ¶ 37; Pl.'s Facts ¶ 64.) During her deposition, Contreras testified that

Byrne notified her about Eastman's conduct including laughing, telling Byrne that she was a bit off and "knocked off her feet", and about taking the Valium given by Dr. Lumerman. (Def.'s Facts ¶¶ 37-39; Pl.'s Resp. to Def.'s Facts ¶¶ 37-39; Pl.'s Facts ¶¶ 65-66.)[4] Additionally, Byrne told Contreras that she was worried Lisa would escalate the incident internally at Allergan. (Def.'s Facts ¶ 41; Pl.'s Resp. to Def.'s Facts ¶ 41.) After Contreras's phone call with Byrne, she sent an email to Karen McConnell, a human resources generalist for RPS. (Def.'s Facts ¶ 42; Pl.'s Facts ¶ 72.) In the email, Contreras relayed the conversation she had with Byrne about Eastman, including Eastman's behavior and use of the Valium given by Dr. Lumerman.[5] (Def.'s Facts ¶ 42; Pl.'s Facts ¶¶ 73-77.) McConnell replied to Contreras that they needed to discuss Eastman and to set up a time to talk to her. (Pl.'s Facts ¶79.)

---

[4] Eastman disputes that she said she was "knocked off her feet." (Pl.'s Resp. to Def.'s Facts ¶ 35.)

[5] In its statement of material facts, the defendant uses Contreras's deposition and her email to Karen McConnell to establish what happened during the teleconference among Eastman, Byrne, and Lisa. Eastman correctly points out that Byrne's statements to Contreras are hearsay and "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009). If, however, defendant can produce Byrne at trial to testify about Eastman's statements during the teleconference (which are admissible as admissions by a party opponent under Rule 801(d)(2)(A) of the Federal Rules of Evidence), then Byrne's statements can be considered on summary judgment. *See J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (holding that "hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that 'would be admissible at trial'") (internal citation omitted). However, it is RPS's burden to prove that Byrne would testify at trial, and here it has failed to do so. *See Howley v. Experian Info. Solutions, Inc.*, 813 F. Supp. 2d 629, 637 (D.N.J. 2011) (holding that because plaintiff failed to prove that the witness would be available to testify at trial, their statements were inadmissible.) Accordingly, Byrne's statements are inadmissible hearsay and I will not use them to prove the truth of what happened during the teleconference; I only discuss them to show what effect they had in relation to Contreras's and RPS's actions.

On December 7, 2010, Contreras and McConnell spoke with plaintiff by telephone. (Def.'s Facts ¶ 44; Pl.'s Facts ¶ 86.) Jim Jackson, executive director of human resources at RPS, was also on the line; however, he did not announce himself and, accordingly, Eastman was unaware of his presence. (Pl.'s Facts ¶ 87.) During the call, McConnell told Eastman that there had been a report of Eastman's abnormal behavior on December 2, 2010. (*Id.* ¶ 90.) Additionally, McConnell asked Eastman if she had taken Valium and if she had a prescription for the Valium. (Def.'s Facts ¶ 45; Pl.'s Facts ¶¶ 92, 95.) Eastman responded that she did take a Valium pill before the teleconference on December 2, and that she did not have a prescription, but that Dr. Lumerman had given her the pill. (Def.'s Facts ¶ 46; Pl.'s Resp. to Def.'s Facts ¶ 46.) McConnell told Eastman to continue working and that she would discuss this issue with her later. (Pl.'s Facts ¶ 100.) Subsequently, Eastman contacted Byrne to inquire about Byrne's perception of Eastman's behavior on the December 2 teleconference call. (Def.'s Facts ¶ 49; Pl.'s Resp. to Def.'s Facts ¶ 49.) Byrne explained to Eastman that Eastman should not have told Allergan she had taken Valium. (Def.'s Facts ¶ 50; Pl.'s Resp. to Def.'s Facts ¶ 50.)

After McConnell's December 7 phone call with Eastman, McConnell and Jackson had a discussion about what actions RPS should take regarding Eastman's behavior. (Def.'s Facts ¶ 51; Pl.'s Facts ¶¶ 102,106.) On December 8, 2010, Contreras, McConnell, and Jackson called Eastman again. (Def.'s Facts ¶ 51; Pl.'s Facts ¶¶ 102, 106.) During the phone call Jackson discussed Eastman's use of Valium without a prescription. (Def.'s Facts ¶ 52; Pl.'s Facts ¶ 110.) Eastman told Jackson that she could get Dr. Lumerman to document what had happened; however, Jackson responded that a retroactive prescription would not be valid. (Pl.'s Facts ¶¶ 111-12.) Additionally, Jackson told Eastman that she should not have gone into work that day

and instead sought medical help. (*Id.* ¶ 114.) RPS contends that Jackson informed Eastman that she was fired for unprofessional behavior[6] and for violating RPS's drug free work place policy ("drug policy").[7] (Def.'s Facts ¶ 53.) Plaintiff agrees that Jackson said she was fired for violating the drug policy by taking a controlled substance without a prescription, however, she argues that Jackson never terminated her for unprofessional behavior. (Pl.'s Facts ¶ 109.) For summary judgment purposes I must, obviously, accept her version. Subsequently, Jackson notified Eastman that she would still be paid for the days it took to complete her outstanding reports. (Def.'s Facts ¶ 53; Pl.'s Facts ¶¶ 117-18.) Eastman testified that she notified Jackson that she was still in a lot of pain and needed to go to a medical doctor, and would let RPS know the doctor's diagnosis.[8] (Pl.'s Facts ¶ 119.)

On December 10, 2010, McConnell emailed Eastman and requested an update on her medical status after her doctor's visit. (*Id.* ¶ 127.) On December 13, 2010, Eastman and

---

[6] During his deposition, Jackson testified that Eastman's unprofessional behavior consisted of participating in the teleconference call while under the influence of Valium. (Opp. Ex. E, Dep. of James Jackson (Jan. 21, 2013) ("Jackson Dep.") at 74:2-7.) In defendant's brief it now contends that Eastman's December 2, 2010 unprofessional behavior, for which she was fired, included: accepting the Valium from the hosting physician, ingesting the Valium shortly before the teleconference call with Allergan, and her conduct on the call including telling the Allergan employees she wore slippers to the trial site. (Def.'s Br. in Supp. of Mot. Summ. J. ("Def.'s Br.") at 10.)

[7] At his deposition, Jackson testified that the violation was taking Valium, a controlled substance, without a prescription. (Opp. Ex. E, Jackson Dep. at 74:8-11.) Eastman confirmed this. (Opp. Ex. C, Dep. of Linda Eastman (Dec. 3, 2012) ("Eastman Dep.") at 148:15-23.) However, during Eastman's unemployment hearing Jackson denied that she was terminated for violating the drug policy, and stated she was only fired for unprofessional behavior. (Opp. Ex. R, Unemployment Hearing of Linda M. Eastman (Mar. 16, 2011) at 10:20-11:2.)

[8] Defendant does not mention Eastman notifying Jackson of her need to see a doctor regarding finishing up her reports. Additionally, in his deposition Jackson testified that he did not remember this discussion. (Pl.'s Facts ¶ 119; Opp. Ex. E, Jackson Dep. at 60:16-61:01.)

McConnell emailed back and forth discussing Eastman's medical condition, medical treatment, and her ability to finish the reports. (*Id.* ¶¶ 129-32.) Additionally, Eastman notified McConnell that she was still in a medically comprised state and needed to seek medical attention, but that she would keep McConnell informed. (*Id.* ¶ 133.) McConnell emailed Eastman and requested that they discuss Eastman's employment by telephone, but Eastman responded that because of her medical condition she could only communicate by email. (*Id.* ¶¶ 134-35.) On December 14, 2010, McConnell wrote a letter to Eastman informing her that December 13, 2010, would be her last day of employment with RPS.[9] (Def.'s Facts ¶ 55; Pl.'s Facts ¶¶ 140.) After receiving the December 14, 2010 letter, Eastman emailed McConnell on December 27, 2010, to fully inform McConnell about her back condition. (Pl.'s Facts ¶ 146.) When McConnell did not respond to Eastman's December 27, 2010 email, Eastman forwarded the email to the CEO of RPS, Daniel Perlman. (*Id.* at ¶ 147.)

### B.     Post Termination Review

On January 5, 2011, in response to Eastman's December 27 email, Aly Yantes, executive vice president of global human resources for RPS, emailed Eastman to notify her that she would conduct an executive level review of Eastman's termination. (Def.'s Facts ¶ 57; Pl.'s Facts ¶ 148.) On January 7, 2011, Eastman emailed Yantes and asked Yantes to provide a reason for her termination so she could inform unemployment. (Pl.'s Facts ¶ 149.) Yantes responded on January 7 that she wanted to talk with Eastman directly. Yantes also notified Eastman that she had not been fired for taking a controlled substance without a prescription. (*Id.* at ¶ 150.) Yantes

---

[9] Both parties agree that Eastman was notified of her termination on December 8, 2010; however, her last day of employment was not until December 13, 2010, because defendant wanted her to complete reports. (*Id.*)

conducted the executive level review, in which she spoke with Jackson and Eastman, and reviewed emails about Eastman's termination. (Opp. Ex. F, Dep. of Aly Yantes (Jan. 21, 2013) ("Yantes Dep.") at 27:1-28:22, 30:18-31:3.) On January 13, 2011, Yantes emailed Eastman to inform her that her December 8, 2010 termination was being upheld by RPS. (Def.'s Facts ¶ 65; Pl.'s Resp. to Def.'s Facts ¶ 65.) In her January 13 email to Eastman, Yantes detailed that during her executive review she found no evidence of hostile behavior or harassment by RPS. (Def.'s Facts ¶ 60; Pl.'s Resp. to Def.'s Facts ¶ 60.) Yantes testified in her deposition that Eastman was fired for inappropriate and unprofessional behavior but not for violating the drug policy. (Opp. Ex. F, Yantes Dep. at 54:2-10.) Additionally, Yantes testified that the unprofessional behavior for which she was fired consisted of "the entire way she conducted herself on the call [with Allergan]," including telling the Allergan employees she was on Valium, slurring her words, and saying that she was "knocked off her feet."[10] (*Id.* at 73:19-74:17.) Eastman disputes that she slurred her words and that she said she was "knocked off her feet"; facts that I must accept for this purpose. (Opp. Ex. C, Eastman Dep. at 130:9-21, 19.)

### C. Eastman's Back Pain and Medical Treatment Related to That Back Pain

After Eastman's December 8, 2010 termination from RPS, she continued to seek medical treatment for her back pain. As explained above, Eastman had been experiencing back pain since Thanksgiving 2010, and had been having difficulty walking, bending, moving, lifting her legs, and changing physical positions. (Pl.'s Facts ¶¶ 5-8, 27.) While Eastman's November-through-

---

[10] In its brief defendant now adds that Yantes upheld the termination due to Eastman's unprofessional behavior in accepting the medical evaluation and Valium from the hosting physician, raising conflict of interest issues. (Def.'s Reply Br. in Supp. of Mot. Summ. J. ("Def.'s Reply Br.") at 6.)

December-2010 back pain was the worst episode of back pain in her life, Eastman testified that she had had similar but less severe back pain a few times a year for the past two or three years. (*Id.* at ¶¶ 20-23.) In those instances her pain would last for approximately one week, and she treated her back pain by seeing chiropractors. (*Id.*)

Eastman was treated by doctors for her pain in December 2010. As explained previously, the host of the Allergan study, Dr. Lumerman, examined Eastman on December 2, 2010, diagnosed her with musculoskeletal back pain, and gave her a Valium pill. (*Id.* at ¶ 10.) On December 11, 2010, Eastman received chiropractic treatment at Flex Wellness Center. (*Id.* at ¶ 11.) The chiropractor diagnosed Eastman as having internal disc disruption and stated that Eastman could not sit for more than one hour at a time because it would aggravate her pain and her internal disc disruption. (*Id.* at ¶¶ 12-13.) Additionally, on December 21, 2010, Eastman sought medical treatment from an orthopedic doctor, Dr. Kwak, at North Jersey Orthopedic Specialists Pa. Dr. Kwak conducted an MRI on Eastman and diagnosed her with a large herniated disk.[11] (*Id.* at ¶¶ 14-15.) Dr. Kwak prescribed Valium and a week-long course of steroids. Eastman did not take the Valium because she was in the process of looking for a new job, but she took the steroids. (*Id.* at ¶ 27.) After Eastman completed the course of steroids, she continued to suffer from back pain, albeit less severe.  (*Id.* at ¶ 19.)

---

[11] The MRI also showed that Eastman suffered from retrolisthesis of the L5 vertebrae on the S1 vertebrae; at the L5-4 level she suffered from minimal disc bulge and mild facet arthritis; and at the L5-S1 level she suffered from disc desiccation and moderate disc space narrowing, paracentral disc herniation with inferior migration of the extruded disc fragment, impingement of the right S1 nerve root, mild facet arthritis, and mild right and moderate left sided foraminal stenosis. (*Id.* at ¶ 16.)

Eastman was out of work until February 2011.  (Opp. Ex. C, Eastman Dep. at 180:15-19.) Today, she still has back pain and thinks that she may have arthritis of the back. However, her back pain is not as severe and she is able to work and move around. (*Id.* at 155:15-24.)

Eastman filed this action against RPS on April 23, 2012, alleging discrimination in violation of the ADA (count I) and violations of the PHRA (count II). After discovery, RPS filed this motion for summary judgment.

## II.    Standard of Review

A motion for summary judgment will be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted), offering concrete evidence supporting each essential element of its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he

mere existence of a scintilla of evidence" for elements on which it bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

When a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (internal quotation marks and citations omitted). "[A]n inference based upon a speculation or conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III.    Discussion

The ADA "prohibits certain employers from discriminating against individuals on the basis of their disabilities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475 (1999), *superceded in part*, ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110-325, 122 Stat. 3553 (2008). The statute provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[12] Eastman alleges that

---

[12] The same legal standard applies to Eastman's claims under the ADA and the PHRA. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Accordingly, my analysis for Eastman's ADA claim applies to her PHRA claim.

RPS violated the ADA by terminating her because of her disabling back condition.

To establish a prima facie case of discrimination under the ADA, Eastman must show that (1) she has a disability within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by her employer; and (3) she has suffered an adverse employment decision as a result of discrimination. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). If a plaintiff meets this initial burden, the court must then determine whether the plaintiff has put forth direct or circumstantial evidence of discrimination. *See Burris v. Richards Paving, Inc.*, 461 F. Supp. 2d 244, 248 (D. Del. 2006).

If the plaintiff has put forth direct evidence of discrimination, the court uses a "mixed motive" theory, meaning that a "plaintiff need only show that the unlawful motive was a 'substantial motivating factor' in the adverse employment action." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (citation omitted). Upon doing so, the burden of persuasion shifts to the employer, who must prove it would have reached the same decision even if it had not considered the disability. *See Watson v. Se. Penn. Trans. Auth.*, 207 F.3d 207, 215 (3d Cir. 2000) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244-45 (1989)).

If, however, the plaintiff has put forth circumstantial evidence of discrimination, the court uses a pretext theory, which incorporates the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See id.* Under the *McDonnell Douglas* framework, once a plaintiff has established a prima facie case of discrimination, the burden of production then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable treatment. *McDonnell Douglas*, 411 U.S. at 802. Finally, should the defendant produce a

legitimate, nondiscriminatory reason, the plaintiff can defeat summary judgment only by pointing to some direct or circumstantial evidence from which a factfinder could either reasonably: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

If plaintiff puts forward both direct and circumstantial evidence, both the mixed motive and the pretext theories may apply. *See Harp v. Se. Penn. Trans. Auth.*, No. 04-2205, 2006 WL 1517390, at *7 (E.D. Pa. May 31, 2006) (citing *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 512 (3d Cir. 2004); *Shellenberger*, 318 F.3d at 187 n.4).

RPS argues that summary judgment is appropriate because (1) Eastman is not disabled as a matter of law, (2) Eastman has not shown that her termination was a result of discrimination, and (3) RPS has put forth a legitimate nondiscriminatory reason for Eastman's termination, which Eastman cannot show is pretextual.

### A.     Does Eastman Have a Disability?

Eastman's first step of establishing her prima facie case is proving she has a disability within the meaning of the ADA. A plaintiff such as Eastman can establish that she has a disability by demonstrating that she has "a physical or mental impairment that substantially limits [a] major life activit[y]," has "a record of such an impairment," or is "regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)- (C). Eastman only alleges that she was actually disabled; not that she has a record of impairment or is regarded as having such an impairment. To analyze a claim under the first subsection of the definition of disability, a court must first identify the

specific life activities that the plaintiff claims are affected and determine whether those activities are "major life activities" under the ADA, and then evaluate whether the plaintiff's impairment substantially limits those major life activities. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306-07 (3d Cir. 1999).

The ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110-325, 122 Stat. 3553 (2008), became effective on January 1, 2009, and applies to this case because Eastman was removed from her position on December 8, 2010. Congress amended the ADA to broaden its scope by expanding the definition of disability, which had been narrowed by Supreme Court interpretation. *See id*. (finding that Supreme Court precedent, such as *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002), and regulations promulgated by the Equal Employment Opportunity Commission had narrowed the definition of disability in a manner inconsistent with congressional intent). The ADAAA made it significantly easier for plaintiffs to establish that they are disabled under the ADA. The ADAAA provides that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* § 2(b)(5). With the passage of the ADAAA, Congress expanded the statute's non-exhaustive list of "major life activities" and declared that "[t]he definition of disability shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." Pub. L. No. 110-325, §§ 2(b)(1)-(6), 3(2)(a), § 4(a), 122 Stat. 3553, 3555. Major life activities include "performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Additionally, the ADAAA requires a "less searching analysis" of whether a plaintiff is

"substantially limited." *Kravits v. Shinseki*, No. 10-861, 2012 WL 604169, at *17 (W.D. Pa. Feb. 24, 2012). The EEOC has noted that under the ADAAA, "substantially limits" is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(I) and (iii). "Rather, 'the determination of whether an impairment substantially limits a major life activity requires an individualized assessment,' and should 'require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA.'" *Cohen v. CHLN, Inc.*, No. 10–514, 2011 WL 2713737, at *7 (E.D. Pa. July 13, 2011). Ultimately, whether an individual is substantially limited as to a major life activity is a question of fact. *Williams,* 380 F.3d at 763.

Defendant makes a temporal argument and a sufficiency of the evidence argument that plaintiff failed to prove that her limitations are substantial.[13] The focus of RPS's argument is that Eastman's back pain was nonpermanent, and nonpermanent injuries are not disabilities under the ADA as a matter of law. Defendant is correct that case law in this circuit holds that the duration of a disability is a relevant consideration, and that temporary, non-chronic conditions do not qualify as disabilities. *See Emory v. AstraZeneca Pharms. LP*, 401 F.3d 174, 179-80 (3d Cir. 2005). However, since the ADAAA, the EEOC has adopted regulations interpreting the statute. Whereas prior to the ADAAA, the EEOC regulations and Third Circuit case law held that "permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment" was a relevant consideration, *Emory*, 401 F.3d at 179-80 (quoting 29 C.F.R. § 1630.2(j)(1), *amended* 2011), the updated regulations have removed that section and

---

[13] Defendant seemingly agrees that Eastman's internal disrupted disc and other back injuries qualify as impairments under the ADA. Additionally, defendant does not allege that Eastman failed to identify major life activities that were impacted by her back pain. Specifically, Eastman alleges that she was substantially limited in bending, walking, and sitting, which are all major life activities as defined by 42 U.S.C. § 12102(2)(A).

instead explicitly state that "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ix).[14] Additionally, "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id.* § 1630.2(j)(1)(vii).[15] Thus, "[t]hese updated regulations bring into question the continuing vitality of the 'permanent or long term impact factor . . . .'" *Estate of Murray v. UHS of Fairmount, Inc.*, Civ. A. No. 10–2561, 2011 WL 5449364, *8 (E.D. Pa. Nov. 10, 2011).

Eastman testified that she has suffered from back pain for the last two to three years. (Opp. Ex. C, Eastman Dep. at 99:17-100:17.) Specifically, Eastman stated that her back pain

---

[14] All but one of the cases defendant cites do not apply the ADAAA because the alleged discriminatory conduct in those cases occurred before January 1, 2009. The only case defendant cites that applies the more lenient standard of the ADAAA is *Poper v. SCA Americas, Inc.*, Civ. A. No. 10-3201, 2012 WL 3288111 (E.D. Pa. Aug. 13, 2012). In that case, the court found that Poper's back problems did not qualify as a disability under the ADAAA. The court concluded that although Poper had a history of back problems, during the course of his employment with the defendant he only had limitations because of his back for at most one week. *Id.* at *9. Additionally, in *Poper*, the only medical evidence introduced about Poper's back pain during the course of his employment with the defendant was a note from the emergency room doctor when he was admitted following a car accident. *Id.* at *8. One week later Poper went to the hospital again and reported no back pain to the emergency room doctor. *Id.* However, unlike the plaintiff in *Poper,* whose medical records indicated that he suffered from back pain for at most a week during his employment with the defendant in that case (as will be discussed below), in this case there is medical evidence from two medical doctors and a chiropractor that Eastman was suffering from severe back pain for at least a month, and her back pain led to significant limitations including bending, walking, and sitting. Thus, while RPS focuses on the fact that Poper had a more extensive history of back pain than Eastman, the issue in *Poper* was not that he did not have a history of back problems, but that during the time of his employment with defendant, there was no evidence that his back problems significantly impaired him. *Id.*

[15] In *Estate of Murray v. UHS of Fairmount, Inc.*, Civ. A. No. 10–2561, 2011 WL 5449364, *6 n.15 (E.D. Pa. Nov. 10, 2011), Judge McLaughlin concluded that the EEOC regulations interpreting the ADAAA should be given *Chevron* deference because the Third Circuit had previously held that the EEOC regulations interpreting the ADA were entitled to *Chevron* deference. I agree.

would flare up for about a week a few times a year, for the past two or three years. (*Id.*) These earlier episodes of back pain were not as serious as her December 2010 back issues and she treated her earlier back pain by seeing chiropractors. (*Id.*) Eastman also suffered back pain while working at RPS from Thanksgiving 2010 until after she was terminated. (*Id.* at 91:21-92:9, 94:4-95:9.)  Eastman testified that the November through December 2010 back pain was the most severe of her life, and she had difficultly bending, walking, and sitting. (*Id.*) Eastman also testified that on December 2, 2010, Dr. Lumerman noticed she was having difficulty moving, so he examined her, diagnosed her with musculoskeletal back pain, and gave her a Valium pill. (*Id.* at 111:14-112:18.) Additionally, on December 11, 2010, Eastman saw a chiropractor who diagnosed her with disc disruption, and stated that she could not sit for more than one hour at a time because it would aggravate her pain and her internal disc disruption. (*Id.* at 154:06-10; Opp. Ex. T, Note from Chiropractic Physician.) Also, on December 21, 2010, Eastman sought medical treatment from orthopedic doctor, Dr. Kwak, at North Jersey Orthopedic Specialists Pa. (Opp. Ex. C, Eastman Dep. at 154:09-12.) Dr. Kwak conducted an MRI on Eastman and diagnosed her with a large herniated disk and other back issues detailed above. (*Id.* at 154:14-24; Opp. Ex. U, Dr. Kwak's Medical Report.) Dr. Kwak prescribed a week-long course of steroids. (Opp. Ex. C, Eastman Dep. at 181:9-15.) After Eastman completed the course of steroids, she continued to suffer from back pain, but it was less severe. (*Id.* at 181:23-182:06.) Eastman still suffers from some back pain and believes that she may have arthritis. (*Id.* at 155:15-24.)

Thus, Eastman's evidence could allow a jury to conclude that her back pain was not of an insignificant duration. Additionally, under the EEOC's and ADAAA's guidance, "substantially limits" is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(I), (iii). Thus, based

on the broad purpose of the ADAAA and guidance from the EEOC, the temporal duration of Eastman's back pain does not preclude a finding that Eastman's back impairment "substantially limits" major life activities.

Next, RPS argues that Eastman has not put forth enough evidence that she was substantially limited in any major life activity. Defendant argues that while plaintiff testified that she had significant difficulty moving, walking, sitting, and bending, because of her back pain, she also testified that she drove from Clifton, New Jersey, to Brick, New Jersey, and then drove to Garden City, New York. (Def.'s Reply Br. at 2.) Additionally, defendant notes that plaintiff was able to complete full work days. (*Id.*) However, the EEOC's guidance directly undermines RPS's argument by stating:

> In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.

29 C.F.R. § 1630.2(j)(4)(iii). *See also Kravits*, 2012 WL 604169, at *6 (rejecting defendant's argument that plaintiff's physical, social, and academic achievements established that his conditions did not substantially impair his ability to sleep and learn.) Thus, although plaintiff may have been able to drive and work, plaintiff put forth evidence from which a factfinder could reasonably conclude that these activities were more difficult for her as compared to most people in the general population because they caused her significant pain. Accordingly, under the less restrictive standard of the ADAAA, I conclude that Eastman has offered sufficient evidence to

raise a genuine issue of fact as to whether she was disabled at the time she was terminated by RPS.

**B.      Has Eastman Shown That RPS's Termination Was a Result of Discrimination?**

As explained above, to establish a prima facie case Eastman must show three elements: (1) she has a disability within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by her employer; and (3) she has suffered an adverse employment decision as a result of discrimination. *See Williams*, 380 F.3d at 761. I have concluded that there are genuine issues of material fact as to element one, and RPS has not argued for summary judgment on the basis of element two. Consequently, the only question that remains with regard to Eastman's prima facie case is whether Eastman was fired as a result of disability discrimination.

Eastman claims that she has supplied direct evidence that she was fired as a result of her disability; I must determine if she is correct in order to apply the correct framework to this case. "Not all evidence that is probative of illegitimate motives suffices to entitle a plaintiff to a mixed-motives/Price Waterhouse [framework] . . . . [T]he evidence must be such that it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 513 (3d Cir. 1997) (internal quotation marks and citation omitted). In other words, "[d]irect evidence of discrimination is overt or explicit evidence that is so revealing of a discriminatory animus that no presumptions or inferences are needed." *Tolan v. Temple Health Sys. Transp. Team, Inc.*, No. 09-CV-5492, 2013 WL 706049, *n.7 (E.D. Pa. Feb. 26, 2013) (internal quotation marks omitted) (citing *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 485 (E.D. Pa. 1999)). "In

contrast, circumstantial evidence is offered to prove an ultimate fact, but an inferential step by the factfinder is required to reach that fact." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 930 (3d Cir. 1997).

Eastman claims that being terminated for taking a Valium pill to treat her disability is direct evidence of discrimination.[16] (Pl.'s Br. in Opp'n to Mot. for Summ. J. ("Pl.'s Br.") at 26.) Additionally, Eastman claims that defendant's other stated reason for her termination, her unprofessional conduct of taking the Valium before a teleconference, is also directly discriminatory. (*Id.* at 32.) Finally, Eastman argues that RPS's employees' statements, that employees on valium should not interact with clients and should not reveal to clients that they are currently taking Valium, show discriminatory animus. (*Id.* at 34-35.)

Eastman believes that direct evidence showing that an employee was fired for taking a Valium, when that employee also happens to have a disability, is the same as direct evidence that the employee was fired because of the disability. (*Id.* at 28-29.) However, Eastman has cited no authority showing that being terminated for taking a legal drug, like Valium, to treat a disability is direct evidence of discrimination *because* of that disability.[17] Eastman's argument that firing

---

[16] One of the varying reasons defendant claims it fired Eastman was because she took the Valium from Dr. Lumerman without a written prescription, which violated RPS's drug policy. (Def.'s Facts ¶ 53.) In her brief, Eastman explains that taking the Valium from Dr. Lumerman without a written prescription was not illegal, and defendant does not refute that assertion. (Pl.'s Br. at 31.) *See* 21 U.S.C 829 (b) (explaining that a practitioner does not need to give a written prescription for Schedule IV drugs such as Valium when he directly dispenses the drug in his office.) Thus, it seems that although at the time defendant fired Eastman it believed she violated the drug policy, in retrospect, defendant understands that Eastman did not in fact violate the policy in this regard.

[17] Eastman cites no relevant authority to prove her assertion that an employer violates the ADA when it fires someone for taking a drug that can be used to treat disabilities. Eastman's reliance on *EEOC v. Dayton Superior Corp.*, 2:12-cv-00227 (N.D. Ga. Sept. 26, 2012) is

someone for Valium use is *direct* evidence of discrimination is unpersuasive because it relies on the *inference* that firing someone for Valium use means the employer is actually firing the employee because of their disability. However, there are many reasons an employer might fire an employee for taking a drug, especially when that drug can affect cognitive abilities. Finally, none of RPS's employees' statements about Valium use show "a discriminatory or retaliatory animus" to Eastman's back disability; at most they show negative beliefs about Valium use while at work. Consequently, Eastman has simply not met the "high level required of direct evidence . . . ."[18] *Walden*, 126 F.3d at 516.

Because Eastman has not provided direct evidence of discrimination, I must determine if she has put forth circumstantial evidence of discrimination to satisfy her prima facie case. The "burden of establishing a prima facie case of disparate treatment is not onerous." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). "After all, the prima facie case under the McDonnell Douglas framework serves to raise an inference of discrimination on the grounds that we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Decker v. Alliant Technologies, LLL*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (quoting *Burdine*, 450 U.S. at 254) (internal quotation marks omitted).

---

unpersuasive, as that case settled before any dispositive motions were decided. Additionally, *Bates v. Dura Auto. Sys.*, 2011 U.S. Dist. LEXIS 33996, at *16 (M.D. Tenn. March 30, 2011), is not relevant to this case because *Bates* discusses illegal medical inquiries and drug tests under 42 U.S.C. § 12112(d)(4)(A), which are not at issue here because Eastman has not alleged that she was subjected to an illegal medical inquiry.

It is clear that Eastman suffered an adverse employment action because RPS terminated

her employment. *See Decker*, 871 F. Supp. 2d at 428 (holding that termination qualifies as an

adverse employment action.) Additionally, the temporal proximity between when RPS

discovered Eastman was having back issues to the time RPS terminated her is circumstantial

evidence of discrimination. *Id.* at 429.  Toni Contreras, Eastman's supervisor, became aware of

Eastman's back pain on December 2, 2010. (Pl.'s Facts ¶¶ 70-71.) Eastman was fired just six

days later, on December 8, 2010. (*Id.* ¶ 109.) Additionally, defendant has offered no evidence

that RPS had problems with Eastman's job performance prior to December 2, 2010, which also

suggests that she may have been fired because of her back problems. Thus, while Eastman has

not produced substantial circumstantial evidence, based on the light burden of establishing a

prima facie case, Eastman has presented sufficient evidence of a prima facie case to preclude

summary judgment.

### C.   Has Eastman Shown That RPS's Legitimate Nondiscriminatory Reasons for Her Termination Are Pretextual?

Defendant argues that even if Eastman establishes a prima facie case, summary

judgement is still appropriate because RPS has offered legitimate nondiscriminatory reasons for

Eastman's termination, and Eastman cannot show that those reasons are pretextual. Specifically,

defendant's legitimate nondiscriminatory reasons for terminating Eastman are that she was fired

for violating RPS's drug policy and for her unprofessional behavior. Defendant has not been

clear about exactly what constitutes Eastman's unprofessional behavior; however, at varying

times it seems to include: (1) taking the Valium without a prescription, (2) taking the Valium

before a call with a client, (3) giggling on the call, (4) informing the client that she was on

Valium and that she had received it from Dr. Lumerman, (5) telling the client she was "knocked off her feet", (6) commenting about wearing slippers to the trial site, and (7) taking the Valium from Dr. Lumerman the hosting physician.[19][20] (Def.'s Br. at 11.) Thus, I find that defendant's proffered legitimate, nondiscriminatory reasons for terminating Eastman meet the burden required at this stage of the analysis, and thus, I will proceed to the next stage: pretext.

"[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." *Fuentes*, 32 F.3d at 765. However, Eastman does not need to "cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 283 (3d Cir. 2001) (quoting

---

[19] In the depositions only Toni Contreras discussed her concern about the potential conflict of interest of taking the Valium from the hosting physician. Neither Jackson, who fired Eastman, nor Yantes, who upheld her termination, stated that Eastman was terminated because of conflict of interest issues. (Opp. Ex. D, Dep. of Toni Contreras (Jan. 21, 2013) ("Contreras Dep.") at 21:11-15.)

[20] Plaintiff claims that the misconduct for which she was fired, accepting and taking the Valium without a written prescription, and her behavior on the Valium, was a result of her back disability. However, unless an employee has previously asked for or discussed an accommodation for the misconduct caused by their disability, an employer is allowed to terminate the employee for such disability related misconduct. *See Heard v. St. Luke's Hosp.*, No. Civ.A.08–5494, 2009 WL 3081513, at *6–7 (E.D. Pa. Sept. 28, 2009) (holding that terminating an employee for misconduct did not violate the ADA even if the employee's disability caused the misconduct, when the employer only learned of the disability after the termination.) Here the employer knew of the disability at termination, but not at the time of the incident.

*Fuentes*, 32 F.3d at 764 n. 7).

To discredit the employer's stated reason, a plaintiff such as Eastman "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 765. (internal quotation marks, brackets, and citations omitted). If Eastman can show pretext, "she need not present affirmative evidence of discrimination beyond her prima facie showing if a rational factfinder could conclude from the evidence of pretext that [RPS's] actions were discriminatory." *Abramson*, 260 F.3d at 283 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).

Plaintiff contends that she can establish pretext because defendant has given inconsistent and different reasons for her termination. Plaintiff is correct that, "If a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record." *Id.* at 284. In *Abramson*, the Third Circuit reversed the district court's entry of summary judgment for the defendant and held that plaintiff had established enough evidence of pretext to defeat summary judgment in a religious discrimination suit in part by showing that defendant had given different reasons for her termination in an internal memo circulated at the college, before the New Jersey Division of Civil Rights, and at a deposition. *See id.* at 282-83. Similarly, in a case in this district, the court held that the plaintiff had established enough evidence of pretext to defeat summary judgment because the defendant had given different reasons for failing to promote

plaintiff before the court and the Pennsylvania Human Relations Commission ("PHRC"). *Mikell*

*v. Marriott Int'l, Inc.*, 789 F. Supp. 2d 607, 615-16 (E.D. Pa. 2011). In *Mikell*, the defendant told

the PHRC it did not promote plaintiff because plaintiff had withdrawn from consideration, but

before the court defendant stated it did not promote plaintiff because another applicant was more

qualified. *Id.* The court refused to grant summary judgment for the defendant because, "From

these changes, a reasonable factfinder could find Defendant unworthy of credence." *See id.* at

616.

      In defendant's motion for summary judgment, one of its alleged legitimate

nondiscriminatory reasons for terminating Eastman is that she was fired was for violating RPS's

drug policy. (Def.'s Reply Br. at 4). However, during Eastman's unemployment hearing, Jackson

testified that she was not fired for violating the drug policy.[21] (Opp. Ex. R, Unemployment

Hearing of Linda M. Eastman (Mar. 16, 2011) at 10:20-11:2.) Later, during his deposition,

Jackson changed his story and testified that Eastman was in fact fired because of her violation of

the drug policy. (Opp. Ex. E, Jackson Dep. at 73:20-74:01.) Additionally, when Jackson was

presented with the documents he submitted for Eastman's unemployment claim, which only

listed unprofessional behavior as a reason for her termination, Jackson stated that he did not list

the violation of the drug policy because he wanted her to be able to get unemployment. (*Id.* at

---

[21]  Specifically, Jackson testified as follows:

      Q. Okay. And in that phone conference did you tell Ms. Eastman that she was
      being terminated for taking a controlled substance without a prescription?

      A. That was one thing that we talked about but the reason for her termination was
      unprofessional behavior.
(*Id.*)

89:22-90:18.) Thus, Jackson admitted that he has misstated the truth with regard to Eastman's termination before, and this may diminish his and RPS's credibility to a factfinder. Also, Aly Yantes, who conducted the executive level review of Eastman's termination, told Eastman in an email and stated during her deposition that Eastman was not fired for violating the drug policy.[22] (Opp. Ex. M, Opp. Ex. F, Yantes Dep. at 54:2-12.) From these changes in the defendant's reason

---

[22] Defendant tries to explain away the obvious contradiction between its statement that Eastman was fired for violating the drug policy and Yantes's statement that she was not fired for that reason. Defendant argues that Yantes did not deny that plaintiff was fired for violating the drug policy, and instead was merely distinguishing that while plaintiff was fired for violating the drug policy, upon executive review she upheld the termination only based on Eastman's unprofessional behavior. However, Yantes's email to Eastman and Yantes's deposition testimony do not support this explanation. After Eastman requested an executive level review of her termination, Yantes emailed Eastman on January 7, 2011, and stated, "I am sorry that you are confused about things. I can confirm for you that the reason for your termination *was not because you allegedly took a controlled substance without a prescription*." (Opp. Ex. M.) Additionally, during her deposition Yantes testified as follows:

> Q. As part of your executive review, did you look and see if Linda's conduct was a violation of the drug free workplace policy?
>
> A. I believe it was something that we looked at. It was questionable, I think in the beginning when they had talked to her, but that was not the reason she was terminated.
>
> Q. Was it part of the reason she was terminated?
>
> A. No. It had nothing to do with the reason she was terminated.
>
> Q. How do you know that? Who told you that, I mean.
>
> A. That was based on the discussions that Jim had had with her and then based on the executive level review I conducted.

(Opp. Ex. F, Yantes Dep. at 54:2-12.) Thus, after reviewing Yantes's email and deposition, she clearly states that Eastman was not fired for violating the drug policy, and not that she refused to uphold the termination based on this reason.

for Eastman's termination, a reasonable factfinder could find RPS's explanations to lack credibility. *See Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997) ("An inference of pretext may arise if the plaintiff can raise suspicions with respect to the defendant's credibility. . . .") Consequently, looking at the evidence in the light most favorable to the plaintiff, and drawing all inferences in her favor, plaintiff's evidence could potentially persuade a jury that defendant's reasons for termination were pretextual.[23] Accordingly, defendant's motion for summary judgment must be denied.

## IV.     Conclusion

For the reasons explained above, I will deny RPS's motion for summary judgment. An appropriate order follows.

---

[23] Defendant claims that Eastman cannot establish pretext because she stated in her deposition testimony that the only reason she believed she was fired was for taking the Valium without a prescription, in violation of the drug policy–she did not mention being terminated specifically because of her back pain. (Def.'s Br. at 12-13.) However, as explained above, at various times defendant has emphatically asserted that plaintiff was not fired for taking Valium without a prescription. Consequently, although plaintiff may have believed at the time of her deposition that she was fired for violating the policy, this does not change the fact that there is now, after discovery has ended, a factual dispute about whether she was fired for violating the policy.